**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ELEPHANT BUTTE IRRIGATION DISTRICT
OF NEW MEXICO, EL PASO COUNTY WATER
IMPROVEMENT DISTRICT NO. 1, OF TEXAS,

        Plaintiffs,

vs.                                     Civ. No. 90-95 JP/KBM

UNITED STATES DEPARTMENT OF THE
INTERIOR; et al.,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 29, 2003 the Court held a Status Conference to discuss a Motion for Order to Show Cause filed by Plaintiff Elephant Butte Irrigation District ("EBID") on April 29, 2003 (Doc. No. 366).  Also discussed at the conference were several issues identified in the Court's July 25, 2003 letter to counsel, as well as other issues that remain for decision before the Court will be in a position to equitably reform the recreation lease between the United States and the State of New Mexico, enter a Final Judgment on Count II, and dismiss this long-lived, seemingly interminable case.  This Memorandum Opinion and Order resolves many but not all these issues.  The parties will hereafter enter settlement negotiations with Magistrate Judge Molzen to attempt to resolve the remaining outstanding issues.

    1.      <u>Plaintiff EBID's Motion for Order to Show Cause</u>.

In its Motion for Order to Show Cause, Plaintiff EBID seeks to have the Federal Defendants held in contempt for their failure to comply with certain provisions of the Final Judgment issued by the Honorable Howard C. Bratton on July 20, 1999.  Paragraphs 3, 4 and 5

of the Final Judgment provide that credits in specified amounts be given to the two Plaintiffs for net profits from two sources of revenues:  from grazing and farm leases on the one hand, and from a gas pipeline permit or easement on the other.

Federal Defendants do not contest their duty to provide credits for the grazing and farm lease profits.  That duty achieved finality in 2001 when the Tenth Circuit affirmed Judge Bratton's rulings on Counts I and VI.

Federal Defendants do challenge their duty to credit Plaintiffs with the money derived from the gas pipeline permit or easement.  That matter, however, was included in Paragraph 5 of the July 20, 1999 Final Judgment,[1] and was not appealed by either side.  Thus it achieved finality in 1999.  The Clerk will be ordered to disburse those funds to Federal Defendants for crediting to Plaintiffs.

The conduct of Federal Defendants in failing to provide the credits from grazing and farm leases is not sanctionable.  Rather, it is most accurately described as inadvertent.  There has been no attempt to evade the final judgment.  In fact, until EBID filed the show-cause motion, neither Plaintiff had made a specific demand for the credits ordered in the Final Judgment after the Tenth Circuit Opinion was issued on October 25, 2001.  Federal Defendants' duty to provide these credits simply "fell through the cracks" in this lengthy and complex case.  Federal Defendants now acknowledge their responsibility to credit Plaintiffs with the amounts of grazing and farm leases revenues determined by the 1999 Final Judgment, and have made a commitment to include these

---

[1]  Paragraph 5 of the July 20, 1999 Final Judgment provides:  "The funds held in the Court Registry under the Stipulated Order entered January 15, 1993, including accrued interest, are ordered to be disbursed to the Federal Defendants upon entry of this Judgment and the Federal Defendants are ordered to include such funds in the credit to be provided the plaintiffs under paragraph 3 of this Judgment."

amounts in the budget for the fiscal year beginning October 1, 2003.  The Motion for Order to Show Cause will be denied.

       2.    <u>Lease Reformation Issues</u>.

Under the prior decisions of this Court, the recreation lease between the United States and the State of New Mexico will be reformed.  The reformed lease will provide that the State's net profits are to be paid by the State to the United States, and that the United States' net profits are to be credited to the Plaintiffs under Subsection I of the Fact Finders Act.  The parties have been unable to agree on several matters that will affect the terms of the reformed recreation lease, and that will impact how net profits and credits will be determined for past and future years.

The current lease gives the State discretion to charge "reasonable" rates at the Parks. 1973 Lease, ¶ 12.a. at 6.  The current lease also provides that the State must account for all revenues from "rents and other income from concessions, licenses, permits, leases, and other contracts." <u>Id.</u>, ¶ 12.b. at 6.  It also provides that the State either must use "all revenue" for "further development" of the State Parks, or may deposit the revenue in a reserve account for future development and improvements "within the area of the Leased Premises", or may use "net income from State financed improvements . . . for any purpose authorized by State law . . .." <u>Id.</u> The lease also requires the State to perform annual audits and submit annual reports to the Bureau of Reclamation on all financial aspects of operation and maintenance of the State Parks, except that the State need not include information about revenues from "licenses and permits required by State Law, such as fishing licenses, hunting licenses, boat operating permits, and State user fees." <u>Id.</u>, ¶ 12.c. at 7.

Reformation is an equitable remedy, and the interests of all parties must be considered. Plaintiffs have an entitlement to Subsection I credits for net profits, if any, under the recreation lease. The Court has already ruled that neither the Federal Defendants nor the State Defendants have a duty to generate profits, but if there are profits, they must be credited to Plaintiffs. Both the United States and the State of New Mexico have important interests in the 50-year lease, which was first entered into in 1964 and then replaced in 1973, even though their expectations as to the disposition of profits must be altered under the rulings of this Court. The Court has attempted to balance the interests of all concerned in ruling on the remaining issues. The parties will be afforded an opportunity to resolve any undecided issues through further settlement negotiations. If negotiations are unsuccessful, the Court will invite further briefing before deciding unresolved issues.

### a. Rates charged by State at Parks.

Plaintiffs first propose that ¶ 12.a. of the lease be reformed to require the State to collect "commercially reasonable fees, charges, tolls, and rents" for all recreational activities at the Parks. The Court has already ruled that Plaintiffs' proposal is not appropriate under the prior rulings of this Court and the Tenth Circuit Court of Appeals. Thus the reformed lease need not require the State to charge commercially reasonable rates.

### b. Deductibility of State's Park-Related Capital Expenses.

In determining the State's net profits, Plaintiffs propose that ¶ 12.b. of the lease be reformed to allow the State to expend revenues only "for administration, operation and maintenance of the State Parks." Pls. Draft (Doc. No. 350) at 2. The State Defendants and the Federal Defendants propose that the reformed lease should provide that the State's gross

4

revenues may be applied not only to costs for administration, operation, and maintenance, but also to "costs for capital improvements and replacements of the recreational facilities" at the State Parks.  Dfts. Draft, USDOJ letter of 2/10/03 at 3.[2]

Plaintiffs contend that in determining the State's net profits under the reformed recreation lease, the State should not be allowed to deduct its capital expenditures from its gross revenues. Plaintiffs rely on language in the statute that authorized the Secretary to enter into the recreation lease with the State, Pub. Law 87-542, 76 Stat. 171, July 25, 1962 ("the 1962 Act"), which authorizes the State only to engage in "administration, operation, and maintenance" of the existing federally-constructed and federally-financed recreation facilities.  Because the 1962 Act does not expressly authorize the State to construct new facilities, Plaintiffs maintain that the State may not do so legally, and therefore the State may not deduct the cost of capital expenditures from its gross revenues.

Plaintiffs bolster their statutory argument with language in Judge Bratton's April 23, 1997 Memorandum Opinion and Order to the effect that the State needs "to receive funds to administer, operate and maintain the recreational facilities."  MOO, Apr. 23, 1997 at 14.  In using these words, argue Plaintiffs, Judge Bratton was following the limitations of the 1962 Act.

---

[2] To "assure a minimum level of improvements and replacements" by the State at the Parks, the Defendants' proposal also requires the State to apply roughly half of the revenues it receives from park entrance fees, lease lots, and concession and user fees to costs of capital expenditures, and the rest to "administration, operation, and maintenance."  Id.  The issue of allocation of revenues in certain percentages is apparently important to the United States but it does not impact the issues in this case.

Defendants' draft also contains this clause:  "revenues derived from State financed improvements may be retained by the State and expended as authorized by State law."  The existing lease exempts from the audit requirement revenues "derived from licenses and permits required by State law, such as fishing licenses, hunting licenses, boat operating permits, and State user fees."  1973 Lease, ¶ 12.c. at 7.  The issue of what revenues must be included in the accounting by the State to determine its net profits is of utmost importance to Plaintiffs, but it has not been fully briefed and is not decided in this Memorandum Opinion.  However, the Court notes that the clause allowing the State to retain revenues from State financed improvements appears problematic.

Plaintiffs also contend that as a matter of equity they should not suffer the continued loss of their Subsection I credits by allowing the State to deduct its construction costs from the revenues it collects at the Parks. They assert that making the State pay net profits to the United States without deducting for capital expenses will not damage the federal-state relationship, and that it is fair for the State to shoulder the financial responsibility to provide facilities at the State Parks that benefit the people of New Mexico generally. Also, Plaintiffs assert that the State is getting a good deal by being allowed to maintain its Parks with newly-constructed improvements in large areas of land around the reservoirs that were not authorized by Congress. Combining these arguments, Plaintiffs contend that only by strictly construing the statutory authority of, and limitations in, the 1962 Act will reformation of the recreation lease provide the Irrigation Districts an adequate equitable remedy.

Federal Defendants argue that statutory support can be found for the capital replacements and improvements made by the State because the 1962 Act is not the only statutory authorization for the 1973 recreation lease. The preamble of the 1973 lease refers to the Reclamation Act of 1902 "and acts amendatory thereto, including particularly the Act of Congress of July 25, 1962 . . .." One of the amendatory and supplementary acts to the 1902 Reclamation Act is the Federal Water Project Recreation Act of 1965 ("the 1965 Act"), P.L. 89-72, 79 Stat. 213 (current version codified at 16 U.S.C. § 460*l*.12-460*l*.21), which provides in Section 4:

> At projects, the construction of which has commenced or been completed as of the effective date of this Act, where non-Federal public bodies agree to administer project land and water areas for recreation and fish and wildlife enhancement purposes and to bear the costs of operation, maintenance, *and replacement of existing facilities* serving those purposes, such facilities and

> appropriate project lands may be leased to non-Federal public
> bodies.

Id., Sec. 4, (current version codified at 16 U.S.C. § 460*l*.15) (emphasis added).  Additionally,

Section 1 of the 1965 Act states:  "It is the policy of the congress and the intent of this Act that

. . . project construction agencies shall encourage non-Federal public bodies to administer project

land and water areas for recreation . . . and operate, maintain, and *replace facilities* . . ."

(emphasis added).  Thus, argue Federal Defendants, capital expenditures are specifically

authorized by statute.

Federal Defendants also point to the Reclamation Recreation Management Act of 1992,

an amendment to P.L. 89-72, found in Title XXVIII of P.L. 102-575.  The 1992 amendment

states at Sec. 2802:

> The Congress finds and declares the following . . .
>     (2) Some provisions of the Federal Water Project
> Recreation Act are outdated because of increases in demand for
> outdoor recreation and changes in the economic climate for
> recreation managing entities.
>     (3) Provisions of such Act relating to non-Federal
> responsibility for all costs of operation, maintenance, and
> replacement of recreation facilities result in an unfair burden,
> especially in cases where the facilities are old or underdesigned. . . .
>     (5) There should be Federal authority to expand existing
> recreation facilities to meet public demand, in partnership with non-
> Federal interests. . . .

Although this statute post-dates the 1973 recreation lease, it contemplates expansion of existing

recreation facilities by providing for federal assistance in paying for and maintaining expanded

facilities.

Plaintiffs contend that the 1965 Act does not apply to recreation development at the

Elephant Butte and Caballo Reservoirs.  Rather, they argue, it applies only to reclamation projects

7

which the Secretary is involved "in investigating and planning."  16 U.S.C. § 460*l*.12.  They assert

that the investigation and planning stage was long since over because the Rio Grande Project was

authorized, funded and constructed decades before the 1965 Act was passed.  Plaintiffs cite two

cases in support of this argument.  In one case, the court dismissed a mandamus action brought

under the 1965 Act, holding that the Act did not apply to a navigational project that began before

the date of the Act.  Uithoven v. Stone, 906 F. Supp. 369 (N.D. Miss. 1995), *aff'd without*

*opinion,* 96 F.3d 1445 (5th Cir. 1996).  In so holding, the court analyzed language in Section 1 of

the 1965 Act that appears to limit its applicability to federal reclamation projects that are in the

investigation and planning stages.  Acknowledging a lack of clarity in the statute, the court also

turned to legislative history in the form of a House Report that stated that the Act "is applicable

to all projects authorized after the date of this act, including those that may be authorized during

1965."  Id., 906 F.Supp. at 373-74.  The court also reached the merits, holding in the alternative

that if the Act did apply, mandamus would not be an appropriate remedy.  Id., 906 F. Supp. at

374.

        In an earlier case, cited by the Uithoven court, a different court concluded that the 1965

Act did not apply to a project involving construction of a reservoir because the project had been

authorized before passage of the 1965 Act.  Sierra Club v. Froehlke, 392 F.Supp. 130, 142

(E.D.Mo. 1975), *aff'd,* 534 F.2d 1289 (8th Cir. 1976).  The issue in that case was whether the

construction of a reservoir should be stopped because the Army Corps of Engineers had not

received assurances from the State of Missouri for sharing the costs of recreational development

for the project, as required by Sections 2 and 3 of the 1965 Act.

These cases do not support the proposition that the 1965 Act does not apply to the Rio Grande Project because they do not construe Section 4 of the Act, which applies here. Even if Sections 1, 2 and 3 of the 1965 Act are restricted to projects that are in the investigation and planning stages, Section 4 specifically authorizes recreation leases with non-Federal entities like the State of New Mexico at projects, like the Rio Grande Project, that were already completed at the time of the recreation lease. Neither of the cited cases addresses this distinction between the different sections of the 1965 Act. Section 4 contemplates that the lessee would engage in capital development on the leased premises by replacing existing facilities serving the purposes of recreation and fish and wildlife enhancement.

Further, since Section 4 does not expressly restrict capital improvements by the lessee to replacement of those facilities already constructed by the federal agency, this Court will not read that restriction into the statute. Moreover, even if only the 1962 Act applies to the Rio Grande Project recreation lease, the failure of the statute to mention capital expenditures does not mean that expansion of the original federally-constructed facilities is prohibited. No such Congressional intent has been expressed, and none should be implied because such a prohibition would be inimical to the purposes of the 1962 Act, which include encouraging States to take over and run recreation sites on reclamation project sites. Capital improvements at the Parks are necessary to prevent them from declining, failing, or ceasing to function as parks, and to carry out the Congressional purpose to establish recreational opportunities. The facilities that have been replaced or newly constructed at the Parks include restrooms, handicap access, picnic tables, access gates, wind warning lights, playgrounds, RV accommodations, buoys, boat ramps, boat docks, campground shelters, and waste disposal facilities. It would be unreasonable to interpret

the Act as limiting the authorized Park facilities to those constructed by the United States decades ago, or as restricting the State from updating, repairing, renovating, and replacing park facilities. The objective of the 1965 Act is furthered by not only allowing, but by actually requiring, a minimum level of capital improvements at the Parks each year, which is precisely what the existing lease requires the State to do.  The 1965 Act applies to the Rio Grande Project and there is no statutory bar to allowing the State to deduct its costs for capital improvement projects when calculating its net revenues under the recreation lease.

Furthermore, agency interpretations of statutes they administer should be considered.  The Department of Interior and Bureau of Reclamation have interpreted and implemented reclamation law to allow, and even to require, the lessee to make capital improvements at the State Parks. The existing lease clearly contemplates that the State will make capital improvements, including expansion of existing facilities.[3]

Courts typically give deference to agency interpretations of this sort.  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984) (agency's construction of statute it administers is given deference by court if consistent with intent of Congress); Udall v. Tallman, 380 U.S. 1, 16 (1965) (courts show great deference to interpretation of statute by agency charged with its administration); Rosette Inc. v. United States, 277 F.3d

---

[3]  For example, the lease provides that the State will "develop [and] improve . . . the Leased Premises . . . to the extent that funds therefor are available . . . ."  1973 Lease ¶ 2 at 2-3.  It further provides that the State may "construct or cause to be constructed in and upon the Leased Premises buildings, improvements, lodges, cabins, other accommodations, fences, signs, walls, piers, and other structures . . . ."  Id., ¶ 9 at 5.  The lease further allows the State to issue bonds "to pay the cost of buildings, improvements, and other structures and facilities necessary or desirable for the development, improvement, operation and maintenance of the Leased Premises . . . ."  Id., ¶ 10 at 5.  Another clause of the lease provides that the State "may proceed with the development and improvement of the Leased Premises for public recreation purposes and may prosecute to completion a program of improvement and development . . ." in accordance with a 1958 National Park Service report.  Id., ¶ 11 at 6.

1222, 1229 (10th Cir. 2002).  *See also* Kenneth v. Schmoll, 482 F.2d 90, 95 (10th Cir. 1973)

(long-standing agency interpretations of statutes they administer are given additional weight); City

of Roswell, N.M. v. Mountain States Telephone & Telegraph Co., 78 F.2d 379, 382 (10th Cir.

1935) (same).

Further, the equities clearly favor allowing the State to deduct its capital expenses.  The

Irrigation Districts are entitled to Subsection I credits, and the more expenses the State is allowed

to deduct from its gross revenues, the less credits are available to the Irrigation Districts.  It may

be the State's responsibility to benefit the people of New Mexico generally by providing

recreation facilities at the State Parks, but nearly half the credits will go to irrigation users in

Texas.  The State of New Mexico operates the State Parks and charges various fees to users of

the facilities regardless of their state of residence.  It would not be fair to require the State of New

Mexico to bear the costs of construction and to pay net revenues to the United States without

deducting those costs.

It is hard to imagine it would be equitable to require the State to pay for improvements at

the State Parks, and then have to give the United States (for crediting to the Irrigation Districts)

money the State collects from increased user fees directly attributable to those improvements

without any deduction for the State's costs.  Plaintiffs argue that it would not damage the federal-

state relationship to disallow the State's deduction of its capital expenses.  From the perspective

of the United States, however, it would be a disincentive for the State to continue operating and

improving the Parks under the recreation lease if the State could not recoup any of these costs.

The United States has no interest in taking these Parks back from the State, and it wants to see

the State continue to make capital improvements so the Parks remain useful entities.

Therefore, the reformed lease may provide that the State may deduct its capital improvement expenses from gross revenues when calculating its net revenues.

### c. Carry-over of Capital Expenditures into Future Years.

Federal Defendants argue that it is reasonable to allow the State to carry forward its excess capital expenditures into future years.  They contend that if the facilities had been federally-constructed, the costs could be capitalized and depreciated over time under the Chief Financial Officers Act of 1990, P.L. 101-576, 104 Stat. 2838 (codified as amended in scattered sections of 5 U.S.C., 31 U.S.C., and 42 U.S.C.).  Additionally, it is a generally accepted accounting practice to capitalize the costs of construction of facilities and then depreciate those costs over the useful life of the facility, either by the straight-line method or an accelerated method.

Federal Defendants address the Court's concerns expressed in its July 25, 2003 letter about wording in Judge Bratton's 1999 Final Judgment that Subsection I revenues must be "credited on an annual basis," Jt. of 7/20/99, ¶ 6 at 2, and the language in Subsection I providing that net profits be "credited annually."   They argue that corporations regularly calculate their tax liability on an annual basis by accounting for depreciation of capital expenses over several years, and that net profits should be calculated in a similar way under the recreation lease.

Federal Defendants have an interest in increasing the State's incentive to make major improvements, both because this benefits the public generally, and because the United States does not want to take back operation of the Parks.  The less of a liability the Parks are to the State, the less likely the State will be to turn them back or let them become run down.

12

State Defendants argue that allowing capital expenditures to be carried over would not defeat Congress' purposes in enacting Subsection I because amortization of capital expenses is such a standard procedure in the private accounting world.  They refer to GAAP (Generally Accepted Accounting Principles) and Generally Accepted Governmental Accounting Standards, which allow capital expenditures to be applied to future periods if the terms of the agreement explicitly allow for such an arrangement.  Also, State Defendants argue that the Governmental Accounting Standards Board's Statement No. 34 provides that state governments should report depreciation expenses in their annual statement of activities.[4]  Additionally, State Defendants assert that allowing the State to carry forward unused deductions for capital expenses does not prevent annual reports from being made.  Net profits can still be stated on an annual basis.  Thus, allowing carry-over of capital expenses would not be inconsistent with either Judge Bratton's Final Judgment or with Subsection I.

Moreover, State Defendants argue that if the State is not able to carry forward its major capital expenditures, then it loses the incentive to make those expenditures.  Instead, the State would look to smaller-scale developments, which would be less advantageous for the public.  It would be more difficult to obtain funding from the state legislature for major projects that would require a large capital expenditure and result in a loss of revenue to the State.  It would also be risky to attempt to plan around the prospect of overspending park revenues in one year on a major project by obtaining funding for only a portion of the project in one year, because the legislature might not appropriate the funds in succeeding years to complete the project.  This would also slow down the progress of a major project.

---

[4]  The State Defendants refer to these standards, but do not provide citations to or copies of the statements.

Another equitable consideration brought up by State Defendants is that revenues may decrease dramatically in future years as a result of the Lease Lot Conveyance Act of 2002, P.L. 107-335, 116 Stat. 2878, H.R. 706, 2d Session, 107th Congress, which directs the Secretary to convey to the Elephant Butte/Caballo Leaseholders Association, Inc. "as soon as practicable" all the real property from which the State now derives cabin site lease income.  Id., Sec. 5(c)(1). They contend that this will reduce the revenue available for construction projects at the Parks by about $200,000 a year, leaving only income from park entrance fees (about $650,000 to $750,000 a year) to pay for capital improvements.

Plaintiffs argue that no carry-over should be allowed.  Allowing a carry-over would "seal the guarantee that no net revenues would ever result from the recreation lease."  Pls. Br. at 10. Plaintiffs argue that the Secretary's authority is only what she is granted by statute, not what she believes is proper public policy, citing ETSI Pipeline Project v. Missouri, 484 U.S. 495 (1988).  In ETSI, the Court determined that the Secretary of Interior lacked statutory authority to provide water for an interstate coal-slurry pipeline, and upheld the lower court's injunction against the project because the agency's interpretation was flatly inconsistent with the expressed intent of Congress.  Id. at 516-17.  This case differs from ETSI because here Congress has not spoken on the precise issue.  While it is true beyond peradventure that an agency has only that authority that is granted by statute, where the statute is silent or ambiguous, the agency's interpretation of its authority is afforded some weight.

Plaintiffs contend that Congress decided public policy in the 1962 Act.  They also assert that to allow construction expense carry-over would defeat Congress' purpose in enacting Subsection I.  If the Congressional purpose of Subsection I was to provide relief to the Irrigation

14

Districts from some of their expenses, that purpose may be in some conflict with the purposes of other laws authorizing leasing of reclamation project lands by non-federal entities.

The Court believes, however, that the equities favor allowing the State to carry forward its capital expenditures. To hold otherwise would be inconsistent with the reasoning that supports allowing the State to deduct its capital expenses. Thus, the reformed lease may provide that the State may carry forward its excess capital expenditures into future years when calculating its net revenues.

3. Other Issues Affecting the Accounting.

Reformation generally relates back to the time when the instrument being reformed was entered into, in this case 1973. Two obstacles to such relief are the State's Eleventh Amendment immunity and the United States' statute of limitations defense.

a. *Eleventh Amendment Immunity and the State's Obligation to Account for its Revenues and Expenses Under the Recreation Lease from January 25, 1990, the Date of Filing of the Complaint.*

Plaintiffs maintain that an accounting by the State must occur for the period from January 25, 1990, the date of filing of the Complaint, to the present. The current lease already provides for an annual accounting, 1973 Lease ¶ 12(b) at 6, as well as an annual audit, ¶ 12(c) at 7. Historically, these lease requirements may not have been complied with, but after this litigation resulted in some favorable rulings for Plaintiffs, the United States Bureau of Reclamation sent the State a letter on April 16, 1993 requiring compliance. Presumably these annual accountings and audits have been performed ever since. Plaintiffs maintain that the State Defendants can be ordered to pay net profits under the lease from the date of the filing of the Complaint because

"prospective relief" means prospective from the filing of the Complaint, not from the entry of final judgment on Count II.

State Defendants do not object to providing annual accountings from January 25, 1990. They argue, however, that even if the Court disallows the deduction of capital expenses and/or the carry-forward of capital expenditure deductions into future years, the Court must make the effect of its ruling prospective only, starting with the first annual accounting due following entry of final judgment on Count II. To require the State to revise all its accountings under the recreation lease back to 1990, and to pay net profits to the United States, would amount to retroactive monetary relief and infringe on the State's sovereign immunity under the Eleventh Amendment. The Court agrees.

The Tenth Circuit has already ruled that this case meets the test for application of the *Ex Parte Young* doctrine to defeat the State's Eleventh Amendment immunity defense. Elephant Butte Irr. Dist. of N.M. v. Dep't of Interior, 160 F.3d 602 (10th Cir. 1998), *cert. denied* Salisbury v. EBID, 526 U.S. 1019 (1999). In its analysis, one of the factors that the court considered was whether the relief sought by the Irrigation Districts was permissible prospective relief. The court stated:

> Even though the request for relief against the state officials in this case will affect New Mexico's interest in profits under the assignment clause of the lease, the relief will have no retrospective effect. The relief Plaintiffs seek will only affect the state's right to future revenues.

Id. at 611.

Plaintiffs argue that "prospective" relief can be granted retrospectively to the date of filing the Complaint. That argument has not been directly rejected, but it has been seriously questioned

16

by the Tenth Circuit in <u>Harris v. Owens</u>, 264 F.3d 1282 (10th Cir. 2001).  In <u>Harris</u>, the court

held that at least part of a suit to require the State of Colorado to reallocate future tobacco

settlement money was not barred by the Eleventh Amendment, even though it would have a

substantial effect on the state treasury.  <u>Id.</u>, 264 F.3d at 1291.  In a footnote, the court expressed

doubt that the plaintiff could "recover tobacco funds that have already been deposited in the state

treasury and appropriated for other uses."  <u>Id.</u>, n.4.  "With respect to these funds, the alleged

violation may be the wrongful appropriation of money that belonged to Harris.  This action would

be wholly in the past, and ordering Defendants to pay Harris for that past conduct would likely be

considered the practical equivalent of money damages."  <u>Id.</u> (internal quotes and citations

omitted).

      The United States Supreme Court has drawn the line between prospective and retroactive

relief.  In <u>Milliken v. Bradley</u>, 433 U.S. 267 (1977), the Court stated that *Ex Parte Young*

"permits federal courts to enjoin state officials to conform their conduct to requirements of federal

law, notwithstanding a direct and substantial impact on the state treasury."  <u>Milliken</u>, 433 U.S. at

289.  In the earlier case of <u>Edelman v. Jordan</u>, 415 U.S. 651 (1974), the Court reversed a

retroactive award of monetary relief because "it [was] in practical effect indistinguishable in many

aspects from an award of damages against the State."  <u>Edelman</u>, 415 U.S. at 668.   In <u>Edelman</u>,

the relief granted by the district court infringed on sovereign immunity under the Eleventh

Amendment because it ordered retroactive payments of benefits that were found to have been

wrongfully withheld from proper recipients.  415 U.S. at 668.  In <u>Milliken</u>, however, the Court

upheld an injunction that ordered state officials to pay one-half of the costs attributable to certain

educational programs ordered as part of a school desegregation decree.  The decree in <u>Milliken</u>

was properly prospective because it enjoined state officials "to conform their conduct to

requirements of federal law, notwithstanding a direct and substantial impact on the state treasury."

<u>Milliken</u>, 433 U.S. at 289.

Here, ordering the State Defendants to pay the State's net profits under the recreation

lease, if any, to the United States from the date of the filing of the Complaint to the present would

be for past actions rather than future actions, and would amount to the practical equivalent of

money damages as it would require payment out of the state treasury.  Under United States

Supreme Court and Tenth Circuit Court of Appeals precedent, such an order would violate the

Eleventh Amendment.

Consistent with this holding, the Court will not order an accounting by the State

Defendants from the date of the filing of the Complaint.  The United States may, if it has not done

so already, enforce Section 12 of the 1973 lease that requires the State to perform annual

accountings and audits, to assist the Federal Defendants in determining federal net profits from

the recreation lease.

b.  *Requirement of Federal Defendants to Determine Credits Due to Plaintiffs*

*Beginning January 25, 1984, Six Years Prior to the Filing of the Complaint.*

The Federal Defendants argue that unless the State can be ordered to pay its net profits to

the United States, the Federal Defendants cannot be ordered to give any credits to the Plaintiffs.

Thus, it is the position of the Federal Defendants that they cannot credit anything to Plaintiffs until

they have received the funds from the State for its net profits.

The Court disagrees with the Federal Defendants' position.  Reformation is an equitable

remedy that normally relates back to the date when the flawed instrument was executed.  The only

bar as to the United States is the six-year statute of limitations.  Plaintiffs' claims against the

Federal Defendants for credits from January 25, 1984 are not defeated by the State's immunity.

Put another way, the Federal Defendants cannot piggyback federal immunity on the State's

immunity.

Federal Defendants also argue that it should be the Secretary who determines the credits

in the first instance.  Plaintiffs maintain that all the determinations by the Secretary should be

made under direct Court order and supervision, based on past experience.  Plaintiffs want to avoid

"an administrative morass completely within the control of the Secretary, as her predecessor tried

to do before.  Otherwise the Court's orders, and Final Judgment, will be undermined."  Pl. Br. at

18.

The Court will order the Federal Defendants to conduct the accounting, according to the

parameters outlined by the Court in this Memorandum Opinion and in previous memorandum

opinions and orders, but it will not oversee the determination.  If Plaintiffs have a dispute about

the manner in which the accounting is done, or with the accuracy of the accounting, they may

bring that to the Court's attention after good-faith attempts to negotiate settlement of the matter.

No discovery will be allowed at this time.

THEREFORE IT IS ORDERED that Plaintiff EBID's Motion for Order to Show Cause

(Doc. No. 366) is hereby denied.

IT IS FURTHER ORDERED that the Federal Defendants must provide credits in the

current fiscal year to Plaintiffs for grazing and farm leases, as provided in the July 20, 1999 Final

Judgment.

IT IS FURTHER ORDERED that the Clerk will disburse the funds held in the Court Registry to Federal Defendants, who must then credit the amount of the funds to Plaintiffs' accounts.

IT IS FURTHER ORDERED that the Federal Defendants must perform and provide to Plaintiffs an accounting of federal net profits under the recreation lease from January 25, 1984 to the present.

IT IS FURTHER ORDERED that the parties must enter settlement negotiations with United States Magistrate Judge Karen B. Molzen at times that are mutually convenient for all parties involved.

_____

SENIOR UNITED STATES DISTRICT JUDGE